**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

SPX Corporation, a Delaware corporation,

Plaintiff,

v.

Daniel Fitzsimmons and
FieldWorks, Incorporated,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-369 ADM/AJB

---

Karen G. Schanfield, Esq., and Sara Gullickson McGrane, Esq., Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, Minnesota, appeared for and on behalf of the Plaintiff.

Mary G. Dobbins, Esq., Mary G. Dobbins & Associates, Edina, Minnesota, appeared for and on behalf of Defendant Daniel Fitzsimmons.

J Jackson, Esq., and Todd W. Schnell, Esq., Dorsey & Whitney LLP, Minneapolis, Minnesota, appeared for and on behalf of Defendant FieldWorks, Incorporated.

---

## I. INTRODUCTION

The above-titled matter came on for hearing before the undersigned United States District Judge on March 1, 2000, pursuant to Plaintiff's Motion for Temporary Restraining Order [Doc. No. 2]. Plaintiff SPX Corporation ("SPX") seeks an injunction enjoining its former employee, Defendant Daniel Fitzsimmons ("Fitzsimmons"), from commencing employment with Defendant FieldWorks, Incorporated ("FieldWorks"). SPX alleges that Fitzsimmons's employment with FieldWorks would violate a noncompetition agreement between Fitzsimmons and SPX. For the reasons set forth below, the motion is denied.

FILED 3 6 00
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. BACKGROUND

Fitzsimmons, who has a background in mechanical engineering, was employed by SPX from July 1, 1996 to February 18, 2000 as a product engineering manager for the company's mechanical tool segment of its "Service Solutions" division. See Affidavit of Daniel J. Fitzsimmons ¶ 2. Fitzsimmons supervised other engineers responsible for designing and engineering mechanical tools for SPX customers, but he was not involved in the design of individual products or with marketing the products to customers. See id. ¶ 4. He worked in SPX's Owatonna, Minnesota, facility in a division that was housed in a different facility than the company's electronic and high-tech operations. See id. ¶ 2.

In or about November 1996, an SPX employee orally informed Fitzsimmons that he was eligible to participate in the company's "EVA" bonus plan. See id. ¶ 15. On December 17, 1996, Fitzsimmons received a letter confirming his participation in the plan. See id. ¶ 15 & Ex. A. Fitzsimmons has sworn that he was never informed that signing a noncompetition agreement was a condition of his participation in the bonus plan. See id. ¶ 15. SPX has produced no evidence to the contrary. It was not until mid-January 1997 that Fitzsimmons was given a copy of the noncompetition agreement and directed to sign it. See id. ¶ 16. Although Fitzsimmons claims he was reluctant, he signed the agreement on January 29, 1997, under the impression that it was a condition of his continued employment and that he had no choice in the matter. See id. ¶ 17 & Ex. B. Fitzsimmons alleges that he was told by the president of his division that it was necessary for him to sign the noncompetition agreement and that "it didn't mean much anyway." See id. ¶ 16.

The first paragraph of the agreement states that Fitzsimmons agreed to the restriction

"[i]n consideration of my continued employment by SPX Corporation ("SPX"), my next scheduled salary adjustment, my continued participation in the company's EVA Bonus Plan, any future salary and benefit adjustments and/or promotions, and any other positions that I may subsequently hold with SPX . . . ." See id. at Ex. B. The noncompetition clause of the agreement states:

> I agree that during the term of this Agreement, and for a period of two (2) years after the termination of my employment with SPX, I will not enter employment with, or directly own an interest in, or manage, operate, control, or participate in the business of, any organization doing business anywhere in the world, whose business is in competition with that of SPX, without the express written authorization of the CEO of SPX. It is understood that while such authorization may be withheld for any reason in the sole discretion of the CEO of SPX, such authorization shall not be unreasonably withheld.

Id. Counsel for SPX explained at the hearing that the document signed by Fitzsimmons was a standard form contract containing boilerplate language, which the company uses for its employees in all states.

The December 17, 1996 letter Fitzsimmons received confirming his participation in the EVA bonus plan does not state that participation was contingent upon the noncompetition agreement. See id., Ex. A. Nor does it state that Fitzsimmons was enrolled in the "executive" plan, as opposed to the "basic" plan. It states that Fitzsimmons was named to participate because he was a "key member of the SPX leadership team . . . ." Id. Incentive bonuses under the plan were tied to his business unit's "growth in Economic Value." Id. Each year he was employed with SPX, Fitzsimmons received a letter informing him of his continuing eligibility for the EVA bonus plan. See id. ¶ 18 & Exs. C-1, C-2.

According to SPX's human resources manager, Fitzsimmons initially participated in

SPX's "basic" cash bonus plan when he started his employment. See Affidavit of Timothy R. Schramm ¶ 6. Based upon Fitzsimmons's work performance in the first six months of his employment, he became eligible for the company's Executive EVA plan. See id. ¶ 7. The Executive EVA plan is available only to "key" employees who sign confidentiality and noncompetition agreements. See id. ¶¶ 6, 7.

In January 2000, SPX reorganized its engineering departments. As part of the reorganization, SPX assigned Fitzsimmons to supervise mechanical engineers in the commercial, agricultural, recreational, government, and off-highway group, otherwise known as "CARGO." See Fitzsimmons Aff. ¶ 7. Fitzsimmons contends that his role after the reorganization was strictly limited to the mechanical engineering area and that he had no access to information from the electronic or computer-based areas or to information about strategic planning and marketing of products. See id. ¶ 9. Fitzsimmons, however, made a presentation to a newly formed CARGO sales team on January 27, 2000 to familiarize members with his mechanical division's work. See id. ¶ 10. Fitzsimmons contends that he was not made privy to sales strategies or confidential customer information at the meeting. See id. ¶ 25. Nor was he told about SPX's plans to compete with FieldWorks for specific customers. See id. ¶ 22.

SPX's vice president of sales and marketing argues that Fitzsimmons was a key part of the company's sales team and that he was given all marketing and customer information. See Affidavit of Andrew D. Shadoian ¶¶ 5, 6, 7. SPX contends that if Fitzsimmons were to share the information he gained at SPX with FieldWorks, SPX is likely to lose accounts with certain customers. See id. ¶ 17

In or about February 2000, a "headhunter" representative of FieldWorks contacted

Fitzsimmons about a job opening for which Fitzsimmons would qualify. See Affidavit of Steve Wagner ¶ 9. FieldWorks had advertised the opening for a mechanical engineer manager in October of 1999, but then contacted an employment search agency to recruit eligible candidates. See id. ¶ 4, 5 & Ex. A. Fitzsimmons applied for the job, and was one of five applicants to interview for the position. See id. ¶ 10. Fitzsimmons contends that he was unaware at the time that SPX considered FieldWorks to be a competitor. See Fitzsimmons Aff. ¶ 28. Upon receiving an offer, Fitzsimmon accepted employment with FieldWorks, in part because the job offered a shorter commute and a smaller group of employees to supervise. See id. ¶ 11.

## III. DISCUSSION

### A. Standard of Review

Because jurisdiction for this suit is grounded on diversity, 28 U.S.C. § 1332, federal procedural rules govern but Minnesota substantive law applies. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Thus, when a party seeks injunctive relief, the Court is to apply the well-known standard established by the Eighth Circuit Court of Appeals in Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). A restraining order may be granted after evaluation of the following factors: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest. See id. The plaintiff bears the burden of proof on all four factors. See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

No one factor is dispositive; rather, each factor must be considered when weighing the balance of the equities. See United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir.

1998).

**B. Analysis of Factors**

**1. Likelihood of success on the merits**

Fitzsimmons and FieldWorks argue that SPX is unlikely to succeed on the merits of its claims because, *inter alia*, the noncompetition agreement is invalid for want of consideration. Noncompetition agreements are generally disfavored under Minnesota law and will be closely scrutinized because they constitute partial restraint of trade. See National Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn. 1982).

The adequacy of consideration for a noncompetition contract entered into in the course of an employment relationship depends upon the facts of each case. See Davies & Davies Agency, Inc. v. Davies, 298 N.W.2d 127, 130 (Minn. 1980). Under certain circumstances, mere continuation of employment may serve as consideration for a noncompetition agreement, but the agreement must be "bargained for and provide the employee with real advantages." Id. at 131. Where an employee receives no raises or promotions as a result of the agreement or where other employees with similar compensation arrangements were not asked to sign such an agreement, mere continuation of employment is not enough to serve as consideration. See Jostens, Inc. v. National Computer Sys., Inc., 318 N.W.2d 691, 703-04 (Minn. 1982).

When a covenant not to compete is not ancillary to an initial employment contract, it can be sustained only if supported by independent consideration. See National Recruiters, 323 N.W.2d at 740. The rule is intended to ameliorate the unequal bargaining power between an employer and its employee. "When the employer fails to inform prospective employees of noncompetition agreements until after they have accepted jobs, the employer 'takes undue

advantage of the inequality between the parties.'" Sanborn Mfg. Co. v. Currie, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993), quoting National Recruiters, 323 N.W.2d at 741. Independent consideration must consist of "real benefits beyond those already obtained by the employee in a previous contract." Sanborn, 500 N.W.2d at 164.

In the present case, SPX did not tell Fitzsimmons before he was employed that he would be required to sign a noncompetition agreement. It was not until six months after his start date that he was told he would have to sign the agreement. Because an SPX executive visited Fitzsimmons to insure that he signed the agreement, Fitzsimmons was under the impression that he may lose his job if he declined. Thus, since the noncompetition clause was not ancillary to either a written or oral employment contract, it must be supported by independent consideration.

SPX argues that Fitzsimmons's participation in the executive bonus plan was the bargained-for, independent consideration for the noncompetition agreement. The record reveals, however, that Fitzsimmons received a letter in December 1996 confirming his selection for the plan *before* he signed the noncompetition agreement. A month before, an SPX employee orally informed Fitzsimmons that he qualified for the plan. SPX proffers no evidence that the employee told Fitzsimmons that participation in the executive bonus plan was contingent upon his signing the noncompetition agreement. Furthermore, the December 17, 1996 letter does not state that Fitzsimmons would be ineligible for the plan until he signed the agreement; rather, the letter confirms his participation and emphasizes that the earning of the bonus is tied to his business unit's performance.

Based on the record presented at this early stage in the litigation, it does not appear that the noncompetition agreement was bargained for or that Fitzsimmons received actual advantage

in exchange for the signing of the agreement. Therefore, SPX has failed to meet its burden in showing that it is likely to prevail on the merits of its claim that the noncompetition agreement is enforceable.[1]

**2. Threat of irreparable harm**

Since the noncompetition agreement is likely invalid, irreparable harm may not be inferred because there cannot be a breach of the agreement. Even if the agreement were valid, however, SPX has not shown by a preponderance of the evidence that Fitzsimmons was entrusted with SPX trade secrets or confidential information. Fitzsimmons had a limited role at SPX in its mechanical engineering division and was not a participant in creating or implementing marketing strategies. His exposure to the SPX sales team was limited to a meeting on January 27, 2000, where his purpose was to explain the responsibilities of his mechanical engineering division and the services it provided. He was hired by FieldWorks for his experience in managing mechanical engineers, not to work in the electrical or diagnostic tool areas in direct competition with SPX.

Furthermore, SPX has not shown that it lacks a remedy in the law. Fitzsimmons and FieldWorks are still bound by unfair competition laws. If either were to misappropriate confidential information, the damage to SPX could be quantified through lost profits that SPX would have earned but for a violation. Therefore, the irreparable harm factor favors the Defendants.

**3. Balance of the harms**

The harm to Fitzsimmons if the restraining order were granted is significant because his

---

[1]Because it appears the noncompetition agreement is invalid for lack of consideration, it is unnecessary to analyze whether the noncompete provision is reasonable or whether SPX and FieldWorks are direct competitors.

source of income and livelihood is threatened. He may be forced out of a job entirely if a possibly invalid noncompetition agreement were to be enforced. FieldWorks would also be harmed because it would have to undertake another search for a qualified mechanical engineer manager. The threat to SPX, on the other hand, is minimal if the noncompetition agreement is invalid. Therefore, the balance of the harms factor also favors the Defendants.

**4. Public interest**

Public policy favors the enforcement of contracts that are valid, reasonable, and not procured through coercion. Thus, it disfavors noncompetition provisions that are not supported by consideration or that would serve as a restraint of trade. Therefore, the public interest factor also weighs in favor of the Defendants.

After evaluating the Dataphase factors and weighing the equities, this Court finds that SPX has not met its burden in demonstrating the need for a temporary restraining order enjoining Fitzsimmons from commencing employment with FieldWorks.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that SPX's Motion for Temporary Restraining Order [Doc. No. 2] is **DENIED**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: March 3, 2000